ADDENDUM

## 6. SUMMARY OF RELIEF SOUGHT

*Summarize the relief requested by you in each statement of claim above.*

CASH AWARD OF $3,500,000.00

Do you want a jury trial? Yes X   No_____

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on ____4/25/08____
(date)

Gail Garner

**NOTE:** *Each plaintiff must sign this complaint and must also sign all subsequent papers filed with the Court.*

Gail Garner

Signature(s) of Plaintiff(s)

## ADDENDUM 2    -    Listing of Exhibits

EXHIBIT 1        Correspondence of DII Trust and
                 Estate of Angelo Palermo

EXHIBIT 2        DII Trust Pro Se Claim Form

EXHIBIT 3        DII Exhibit "A" Entity List and Codes

EXHIBIT 4        Subsidiary List

EXHIBIT 5        History of Symington

EXHIBIT 6        Angelo Palermo's Social Security Record,
                 1941-1945 Symington-Gould
                 'Design For Growth' – Average Incomes

EXHIBIT 7        DII Trust Distribution Procedures (TDP)

EXHIBIT 8        DII Trust Pro Se procedures

EXHIBIT 9        DII Trust Alternative Dispute Resolution (ADR) Procedures

EXHIBIT 10       DII Election Form and Agreement For Non-Binding
                 Arbitration, Signed By All Parties As Accepted And
                 Consented To

EXHIBIT 11       Copies Of Prior Settlement Checks

EXHIBIT 12       Listing of Members Of The DII Trust

EXHIBIT 13       Sworn Affidavit of Gail Garner, Duly Authorized
                 Representative

# ADDENDUM 3

<u>Articles Attached:</u>

- o Asbestos Defendant Profile –Halliburton-

- o Under the Radar- What's Halliburton's Really Worth

- o N.Y.U. Environmental Law Journal – Verdicts and Settlements

- o Weitz & Luxenberg Settlements For Mesothelioma

- o What do the Billions Mean?  1943 -  Re:  Symington-Gould

# Halliburton Company

3600 Lincoln Plaza
500 N. Akard St.
Dallas, TX 75201-3391
Telephone (214) 978-2600
Fax (214) 978-2611
http://www.halliburton.com

### December 31, 2001 Snapshot

| | |
|---|---|
| Employees | 85,000 |
| Annual Revenues | $13,046,000,000 |
| Annual Earnings | $809,000,000 |
| Total Assets | $10,996,000,000 |
| Total Liabilities | $6,214,000,000 |

### Booked Asbestos-Related Insurance Assets

| | |
|---|---|
| 06/30/2002 | $1,594,000,000 |
| 12/31/2001 | $612,000,000 |

### Booked Asbestos-Related Liabilities

| | |
|---|---|
| 06/30/2002 | $2,196,000,000 |
| 12/31/2001 | $737,000,000 |

Asbestos-Related Claim History:

| Period Ending | Open Claims |
|---|---|
| 06/30/2002 | 312,000 |
| 03/31/2002 | 292,000 |
| 12/31/2001 | 274,000 |
| 09/30/2001 | 146,000 |
| 06/30/2001 | 145,000 |
| 03/31/2001 | 129,000 |
| 12/31/2000 | 117,000 |
| * * * | |
| 12/31/1976 | |
| 12/31/1975 | 0 |

### Claims Settled to Date

| | |
|---|---|
| 214,000 | $173,000,000 |

### Bankruptcy Basics

| | |
|---|---|
| Chapter 11 Petition Date: | None |
| Bankruptcy Case No. | None |
| Bankruptcy Court: | None |
| Bankruptcy Judge: | None |
| Bankruptcy Counsel: | None |
| Exclusivity Expires: | None |
| Chapter 11 Plan Filed: | None |
| Plan's Effective Date: | None |
| § 524(g) Trust Created: | None |
| § 524(g) Trust Contact: | None |

### Asbestos-Containing Products

## Halliburton's asbestos-related liability disclosures:

From the Company's Form 10-Q for the period ending June 30, 2002 at
http://www.sec.gov/Archives/edgar/data/45012/000004501202000053/0000045012-02-000053.txt

During the second quarter of 2002, in connection with our asbestos econometric study, we recorded a pretax expense of $153 million, $123 million after-tax, to discontinued operations for existing and future asbestos claims and defense costs related to previously disposed businesses, net of anticipated insurance recoveries. We also recorded pretax expense of $6 million associated with the Harbison-Walker bankruptcy filing. In addition, based upon the impact of certain second quarter items, we adjusted our 2002 estimated effective tax rate for discontinued operations by recording an $11 million tax provision in the second quarter of 2002.

Asbestos litigation. Several of our subsidiaries, particularly DII Industries, LLC (See Note 13) and Kellogg Brown & Root, Inc., are defendants in a large number of asbestos-related lawsuits. The plaintiffs allege injury as a result of exposure to asbestos in products manufactured or sold by former divisions of DII Industries, LLC or in materials used in construction or maintenance projects of Kellogg Brown & Root, Inc. These claims are in three general categories:

- refractory claims;
- other DII Industries, LLC claims; and
- construction claims.

Refractory claims. Asbestos was used in a small number of products manufactured or sold by Harbison-Walker Refractories Company, which DII Industries, LLC acquired in 1967. Harbison-Walker was spun-off by DII Industries, LLC in July, 1992. At that time, Harbison-Walker assumed liability for asbestos claims filed after the spin-off and it agreed to defend and indemnify DII Industries, LLC from liability for those claims. DII Industries, LLC retained responsibility for all asbestos claims pending as of the date of the spin-off. After the spin-off, DII Industries, LLC and Harbison-Walker jointly negotiated and entered into coverage-in-place agreements with a number of insurance companies. Those agreements provide DII Industries, LLC and Harbison-Walker access to the same insurance coverage to reimburse them for defense costs, settlements and court judgments they pay to resolve refractory asbestos claims.

As of June 30, 2002, there were approximately 7,000 open and unresolved pre-spin-off refractory claims against DII Industries, LLC. In addition, there were approximately 139,000 post spin-off claims that name DII Industries, LLC as a defendant. DII Industries, LLC has taken up the defense of unsettled post spin-off refractory claims that name it as a defendant in order to prevent Harbison-Walker from unnecessarily eroding the insurance coverage both companies access for these claims. These claims are now stayed in the Harbison-Walker bankruptcy proceeding.

Other DII Industries, LLC claims. As of June 30, 2002, there were approximately 128,000 open and unresolved claims alleging injuries from asbestos used in other products formerly manufactured by DII Industries, LLC. Most of these claims involve gaskets and packing materials used in pumps and other industrial products.

Construction claims. Our Engineering and Construction Group includes engineering and construction businesses formerly operated by The M.W. Kellogg Company and Brown & Root, Inc., now combined as Kellogg Brown & Root, Inc. As of June 30, 2002, there were approximately 38,000 open and unresolved claims alleging injuries from asbestos in materials used in construction and maintenance projects, most of which were conducted by Brown & Root, Inc. Approximately 1,000 of these claims are asserted against The M.W. Kellogg Company. We believe that Kellogg Brown & Root has a good defense to these claims, and a prior owner of The M.W. Kellogg Company provides Kellogg Brown & Root a contractual indemnification for claims against The M.W. Kellogg Company.

Harbison-Walker Chapter 11 bankruptcy. On February 14, 2002, Harbison-Walker filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court in Pittsburgh, Pennsylvania. In its bankruptcy-related filings, Harbison-Walker said that it would seek to utilize Sections 524(g) and 105 of the Bankruptcy Code to propose and have confirmed a plan of reorganization that would provide for distributions for all legitimate, pending and future asbestos claims asserted directly against it or asserted against DII Industries, LLC for which Harbison-Walker is required to indemnify and defend DII Industries, LLC. If such a plan of reorganization is confirmed, all pending and future refractory asbestos claims against Harbison-Walker or DII Industries, LLC would be channeled to a Section 524(g)/105 trust for resolution and payment. In order for a trust to be confirmed, at least a majority of the equity ownership of Harbison-Walker would have to be contributed to the trust. We also anticipate a significant financial contribution will also be required to obtain the necessary approvals for the trust. Creation of a trust would also require the approval of 75% of the asbestos claimant creditors of Harbison-Walker.

In connection with the Chapter 11 filing by Harbison-Walker, the Bankruptcy Court issued a temporary restraining order staying all further litigation of more than 200,000 asbestos claims currently pending against DII Industries, LLC in numerous courts throughout the United States. A number of claimants oppose that stay, and filed motions seeking to have the stay terminated. On April 4, 2002, the Bankruptcy Court heard argument on these motions and kept the stay in effect until at least 11 days after the Bankruptcy Court rules on the claimants' motions. When the Bankruptcy Court rules, it may issue a preliminary injunction continuing the stay or it may modify or dissolve the stay as it applies to DII Industries, LLC. It is also possible that the Bankruptcy Court will schedule future hearings while continuing or modifying the stay. At present, there is no assurance that a stay will remain in effect, that a plan of reorganization will be proposed or confirmed, or that any plan that is confirmed will provide relief to DII Industries, LLC. DII Industries, LLC may make a contribution to a trust in order to achieve a confirmed plan. If a plan is not confirmed that provides relief to DII Industries, LLC, it will be required to defend all open

claims in the courts in which they have been filed, possibly with reduced access to the insurance shared with Harbison-Walker.

The stayed asbestos claims are those covered by insurance that DII Industries, LLC and Harbison-Walker each access to pay defense costs, settlements and judgments attributable to both refractory and non-refractory asbestos claims. The stayed claims include approximately 139,000 post-1992 spin-off refractory claims, 7,000 pre-spin-off refractory claims and approximately 110,000 other types of asbestos claims pending against DII Industries, LLC. Approximately 51,000 of the claims in the third category are claims made against DII Industries, LLC based on more than one ground for recovery and the stay affects only the portion of the claim covered by the shared insurance. The stay prevents litigation from proceeding while the stay is in effect and also prohibits the filing of new claims. One of the purposes of the stay is to allow Harbison-Walker and DII Industries, LLC time to develop and propose a plan of reorganization.

DII Industries, LLC agreed to provide up to $35 million of debtor-in-possession financing to Harbison-Walker during the pendency of the Chapter 11 proceeding of which $5 million was advanced during the first quarter of 2002. On February 14, 2002, DII Industries, LLC also paid $40 million to Harbison-Walker's United States parent holding company, RHI Refractories Holding Company. This payment was made when Harbison-Walker filed its bankruptcy petition and was charged to discontinued operations in our financial statements in the first quarter of 2002. Harbison-Walker's failure to fulfill its indemnity obligations, and its excessive erosion of the insurance coverage, required DII Industries, LLC to assist Harbison-Walker in its bankruptcy proceeding in order to protect the shared insurance from dissipation. This insurance will be needed if a trust is to be worked out with the asbestos claimants. The payment to RHI Refractories led RHI Refractories to forgive intercompany debt owed to it by Harbison-Walker, thus increasing the assets of Harbison-Walker. DII Industries, LLC will pay another $35 million to RHI Refractories if a plan of reorganization acceptable to DII Industries, LLC is proposed in the bankruptcy proceedings. A further $85 million will be paid to RHI Refractories if a plan acceptable to DII Industries, LLC is approved by 75% of the Harbison-Walker asbestos claimant creditors and confirmed by the Bankruptcy Court.

As a result of DII Industries, LLC's continuing settlement negotiations with the Asbestos Claimants Committee, or ACC, which was formed as part of the Harbison-Walker bankruptcy, and certain law firms that represent a substantial percentage of the plaintiffs that have asserted Harbison-Walker-related claims against DII Industries, LLC, the temporary restraining order originally entered by the Bankruptcy Court on February 14, 2002 has been consensually extended until at least September 18, 2002. On September 18, 2002, DII Industries, LLC and the ACC will present a status report to the Bankruptcy Court. To the extent that the settlement negotiations continue to make progress, DII Industries, LLC anticipates that the ACC will consent to have the temporary restraining order extended for an additional period of time.

DII Industries, LLC's settlement negotiations with the law firms that represent a substantial majority of plaintiffs that have asserted Harbison-Walker-related claims against DII Industries, LLC have not been limited to

Harbison-Walker-related claims. Rather, DII Industries, LLC is exploring with these law firms the possibility of resolving, on a global basis, all of the refractory asbestos claims, all of the other DII Industries, LLC asbestos claims (including claims related to historic DII Industries, LLC manufacturing operations and Worthington Corporation) and all of the construction asbestos-related claims, including all future asbestos-related claims. These broader negotiations involve difficult and complex issues. At this time there is no assurance that DII Industries, LLC will be able to reach an acceptable agreement. We expect that these negotiations will continue for some time before we will even be able to make a judgment as to whether a global settlement is reasonably likely.

Asbestos insurance coverage. DII Industries, LLC has substantial insurance that reimburses it for portions of the costs incurred defending asbestos claims, as well as amounts paid to settle claims and court judgments. This coverage is provided by a large number of insurance policies written by dozens of insurance companies. The insurance companies wrote the coverage over a period of more than 30 years for DII Industries, LLC, its predecessors or its subsidiaries and their predecessors. Large amounts of this coverage are now subject to coverage-in-place agreements that resolve issues concerning amounts and terms of coverage. The amount of insurance available to DII Industries, LLC and its subsidiaries depends on the nature and time of the alleged exposure to asbestos, the specific subsidiary against which an asbestos claim is asserted and other factors.

Refractory claims insurance. DII Industries, LLC has approximately $2.1 billion in aggregate limits of insurance coverage for refractory asbestos claims, of which over one-half is with Equitas or other London-based insurance companies. Most of this insurance is shared with Harbison-Walker. Many of the issues relating to the majority of this coverage have been resolved by coverage-in-place agreements with dozens of companies, including Equitas and other London-based insurance companies. Recently, however, Equitas and other London-based companies have attempted to impose new restrictive documentation requirements on DII Industries, LLC and other insureds. Equitas and the other London-based companies have stated that the new requirements are part of an effort to limit payment of settlements to claimants who are truly impaired by exposure to asbestos and can identify the product or premises that caused their exposure.

On March 21, 2002, Harbison-Walker filed a lawsuit in the United States Bankruptcy Court for the Western District of Pennsylvania in its Chapter 11 bankruptcy proceeding. This lawsuit is substantially similar to DII Industries, LLC's lawsuit filed in Texas State Court in 2001 and seeks, among other relief, a determination as to the rights of DII Industries, LLC and Harbison-Walker to the shared general liability insurance. The lawsuit also seeks damages against certain insurers for breach of contract and bad faith, and a declaratory judgment concerning the insurers' obligations under the shared insurance. Although DII Industries, LLC is also a defendant in this lawsuit, it has asserted its own claim to coverage under the shared insurance and is cooperating with Harbison-Walker to secure both companies' rights to the shared insurance. The Bankruptcy Court has ordered the parties to this lawsuit to engage in non-binding mediation. The first mediation session was held on July 26, 2002 and additional sessions are scheduled to take place, provided the Bankruptcy Court's mediation order remains in effect, in September, October and November

2002. Given the early stages of these negotiations, DII Industries, LLC cannot predict whether a negotiated resolution of this dispute will occur or, if such a resolution does occur, the precise terms of such a resolution.

Prior to the Harbison-Walker bankruptcy, on August 7, 2001, DII Industries, LLC filed a lawsuit in Dallas County, Texas, against a number of these insurance companies asserting DII Industries, LLC's rights under an existing coverage-in-place agreement and under insurance policies not yet subject to coverage-in-place agreements. The coverage-in-place agreements allow DII Industries, LLC to enter into settlements for small amounts without requiring claimants to produce detailed documentation to support their claims, when DII Industries, LLC believes the settlements are an effective claims management strategy. DII Industries, LLC believes that the new documentation requirements are inconsistent with the current coverage-in-place agreements and are unenforceable. The insurance companies that DII Industries, LLC has sued have not refused to pay larger claim settlements where documentation is obtained or where court judgments are entered. Also, they continue to pay previously agreed to amounts of defense costs that DII Industries, LLC incurs defending refractory asbestos claims. All of the asbestos claims to which this insurance covers are currently stayed by the Harbison-Walker bankruptcy, and consequently the breach of the coverage-in-place agreements is currently having no impact upon DII Industries, LLC.

On May 10, 2002, the London-based insuring entities and companies removed DII Industries, LLC's Dallas County State Court Action to the United States District Court for the Northern District of Texas alleging that federal court jurisdiction existed over the case because it is related to the Harbison-Walker bankruptcy. DII Industries, LLC has filed an opposition to that removal and has asked the federal court to remand the case back to the Dallas County state court. On June 12, 2002, the London-based insuring entities and companies filed a motion to transfer the case to the federal court in Pittsburgh, Pennsylvania. DII Industries, LLC has filed an opposition to that motion to transfer. The federal court in Dallas has yet to rule on any of these motions. Regardless of the outcome of these motions, because of the similar insurance coverage lawsuit filed by Harbison-Walker in its bankruptcy proceeding, it is unlikely that DII Industries, LLC's case will proceed independently of the bankruptcy.

Other DII Industries, LLC claims insurance. DII Industries, LLC has substantial insurance to cover other non-refractory asbestos claims. Two coverage-in-place agreements cover DII Industries, LLC for companies or operations that DII Industries, Inc., either acquired or operated prior to November 1, 1957. Asbestos claims that are covered by these agreements are currently stayed by the Harbison-Walker bankruptcy because the majority of this coverage also applies to refractory claims and is shared with Harbison-Walker. Other insurance coverage is provided by a number of different policies that DII Industries, LLC acquired rights to access when it acquired businesses from other companies. Three coverage-in-place agreements provide reimbursement for asbestos claims made against DII Industries, LLC former Worthington pump division. There is also other substantial insurance coverage with approximately $2.0 billion in aggregate limits that has not yet been reduced to coverage-in-place agreements.

On August 28, 2001, DII Industries, LLC filed a lawsuit in the 192nd Judicial District of the District Court for Dallas County, Texas against certain London-based insuring entities that issued insurance policies that provide coverage to DII Industries, LLC for asbestos-related liabilities arising out of the historical operations of Worthington Corporation or its successors. This lawsuit raises essentially the same issue as to the documentation requirements as the August 7, 2001 Harbison-Walker lawsuit filed in the same court. The London-based insuring entities filed a motion in that case seeking to compel the parties to binding arbitration. The trial court denied that motion and the London-based insuring entities appealed that decision to the state appellate court. The state appellate court denied the appeal and the case should now proceed to resolution in the trial court.

A significant portion of the insurance coverage applicable to Worthington claims is alleged by Federal-Mogul Products, Inc. to be shared with it. In 2001, Federal-Mogul Products, Inc. and a large number of its affiliated companies filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court in Wilmington, Delaware.

In response to Federal-Mogul's allegations, on December 7, 2001, DII Industries, LLC filed a lawsuit in the Delaware Bankruptcy Court asserting its rights to insurance coverage under historic general liability policies issued to Studebaker-Worthington, Inc. and its successor for asbestos-related liabilities arising from, among other operations, Worthington's and its successors' historic operations. This lawsuit also seeks a judicial declaration concerning the competing rights of DII Industries, LLC and Federal-Mogul, if any, to this insurance coverage. DII Industries, LLC recently filed a second amended complaint in that lawsuit and the parties are now beginning the discovery process.

At the same time, DII Industries, LLC filed its insurance coverage action in the Federal-Mogul bankruptcy. DII Industries, LLC also filed a second lawsuit in which it has filed a motion for preliminary injunction seeking a stay of all Worthington asbestos-related lawsuits against DII Industries, LLC that are scheduled for trial within the six months following the filing of the motion. The stay that DII Industries, LLC seeks, if granted, would remain in place until the competing rights of DII Industries, LLC and Federal-Mogul to the allegedly shared insurance are resolved. The Court has yet to schedule a hearing on DII Industries, LLC motion for preliminary injunction.

A number of insurers who have agreed to coverage-in-place agreements with DII Industries, LLC have suspended payment under the shared Worthington policies until the Federal-Mogul Bankruptcy Court resolves the insurance issues. Consequently, the effect of the Federal-Mogul bankruptcy on DII Industries, LLC's rights to access this shared insurance is uncertain.

Construction claims insurance. Nearly all of our construction asbestos claims relate to Brown & Root, Inc. operations before the 1980s. Our primary insurance coverage for these claims was written by Highlands Insurance Company during the time it was one of our subsidiaries. Highlands was spun-off to our shareholders in 1996. On April 5, 2000, Highlands filed a lawsuit against us in the Delaware Chancery Court. Highlands asserted that the insurance it wrote for Brown & Root, Inc. that covered construction asbestos claims was terminated by agreements between Halliburton and Highlands at the time of the 1996 spin-off. In March 2001, the Chancery Court ruled that a termination did occur and that Highlands was not obligated

to provide coverage for Brown & Root, Inc.'s asbestos claims. This decision was affirmed by the Delaware Supreme Court on March 13, 2002. As a result of this ruling, we wrote-off approximately $35 million in accounts receivable for amounts paid for claims and defense costs and $45 million of accrued receivables in relation to estimated insurance recoveries claims settlements from Highlands in the first quarter 2002. In addition, we dismissed the April 24, 2000 lawsuit we filed against Highlands in Harris County, Texas.

As a consequence of the Delaware Supreme Court's decision, Kellogg Brown & Root no longer has primary insurance coverage from Highlands for asbestos claims. However, Kellogg Brown & Root has significant excess insurance coverage. The amount of this excess coverage that will reimburse us for an asbestos claim depends on a variety of factors. On March 20, 2002, Kellogg Brown & Root filed a lawsuit in the 172nd Judicial District of the District Court of Jefferson County, Texas, against Kellogg Brown & Root's historic insurers that issued these excess insurance policies. In the lawsuit, Kellogg Brown & Root seeks to establish the specific terms under which it can seek reimbursement for costs it incurs in settling and defending asbestos claims from its historic construction operations. Until this lawsuit is resolved, the scope of the excess insurance will remain uncertain. We do not expect the excess insurers will reimburse us for asbestos claims until this lawsuit is resolved.

Significant asbestos judgments on appeal. During 2001, there were several adverse judgments in trial court proceedings that are in various stages of the appeal process. All of these judgments concern asbestos claims involving Harbison-Walker refractory products. Each of these appeals, however, has been stayed by the Bankruptcy Court in the Harbison-Walker Chapter 11 bankruptcy.

On November 29, 2001, the Texas District Court in Orange, Texas, entered judgments against DII Industries, LLC on a $65 million jury verdict rendered in September 2001 in favor of five plaintiffs. The $65 million amount includes $15 million of a $30 million judgment against DII Industries, LLC and another defendant. DII Industries, LLC is jointly and severally liable for $15 million in addition to $65 million if the other defendant does not pay its share of this judgment. We believe that during the trial the court committed numerous errors, including prohibiting DII Industries, LLC from presenting evidence that the alleged illness of the plaintiffs was caused by products of other companies that had previously settled with the plaintiffs. We intend to appeal this judgment and believe that the Texas appellate courts will ultimately reverse this judgment.

On November 29, 2001, the same District Court in Orange, Texas, entered three additional judgments against DII Industries, LLC in the aggregate amount of $35.7 million in favor of 100 other asbestos plaintiffs. These judgments relate to an alleged breach of purported settlement agreements signed early in 2001 by a New Orleans lawyer hired by Harbison-Walker, which had been defending DII Industries, LLC pursuant to the agreement by which Harbison-Walker was spun-off by DII Industries, LLC in July 1992. These settlement agreements expressly bind Harbison-Walker Refractories Company as the obligated party, not DII Industries, LLC. DII Industries, LLC intends to appeal these three judgments on the grounds that it was not a party to the settlement agreements and it did not authorize anyone to settle on its behalf. We believe that these

judgments are contrary to applicable law and will be reversed.

On December 5, 2001, a jury in the Circuit Court for Baltimore City, Maryland, returned verdicts against DII Industries, LLC and other defendants following a trial involving refractory asbestos claims. Each of the five plaintiffs alleges exposure to Harbison-Walker products. DII Industries, LLC portion of the verdicts was approximately $30 million. DII Industries, LLC believes that the trial court committed numerous errors and that the trial evidence did not support the verdicts. The trial court has entered judgment on these verdicts. DII Industries, LLC intends to appeal the judgment to the Maryland Supreme Court where we expect the judgment will be significantly reduced, if not totally reversed.

On October 25, 2001, in the Circuit Court of Holmes County, Mississippi, a jury verdict of $150 million was rendered in favor of six plaintiffs against DII Industries, LLC and two other companies. DII Industries, LLC share of the verdict was $21.3 million. The award was for compensatory damages. The jury did not award any punitive damages. The trial court has entered judgment on the verdict. We believe there were serious errors during the trial and we intend to appeal this judgment to the Mississippi Supreme Court. We believe the judgment will ultimately be reversed because there was a total lack of evidence that the plaintiffs were exposed to a Harbison-Walker product or that they suffered compensatory damages. Also, there were procedural errors in the selection of the jury.

Asbestos claims history. Since 1976, approximately 525,000 asbestos claims have been filed against us. Almost all of these claims have been made in separate lawsuits in which we are named as a defendant along with a number of other defendants, often exceeding 100 unaffiliated defendant companies in total. During the second quarter of 2002, we received approximately 26,000 new claims and we closed approximately 7,000 claims. The number of open claims pending against us at the end of the second quarter of 2002, at the end of the first quarter of 2002, at the end of each quarter of 2001 and at the end of 2000 is as follows:

| Period Ending | Total Open Claims |
| --- | --- |
| June 30, 2002 | 312,000 |
| March 31, 2002 | 292,000 |
| December 31, 2001 | 274,000 |
| September 30, 2001 | 146,000 |
| June 30, 2001 | 145,000 |
| March 31, 2001 | 129,000 |
| December 31, 2000 | 117,000 |

The claims include approximately 139,000 at June 30, 2002, 133,000 at March 31, 2002 and 125,000 at December 31, 2001 of post spin-off Harbison-Walker refractory related claims that name DII Industries, LLC as a defendant.

We manage asbestos claims to achieve settlements of valid claims for reasonable amounts. When reasonable settlement is not possible, we contest claims in court. Since 1976, we have closed approximately 214,000 claims through settlements and court proceedings at a total cost of approximately $173 million. We have received or expect to receive from our insurers all but approximately $72 million of this cost, resulting in an average net cost per closed claim of about $336.

Asbestos study and the valuation of unresolved current and future asbestos claims, and related insurance receivables. DII Industries, LLC retained Dr. Francine F. Rabinovitz of Hamilton, Rabinovitz & Alschuler, Inc. to estimate the probable number and value, including defense costs, of unresolved current and future asbestos-related bodily injury claims asserted against DII Industries, LLC and its subsidiaries. Dr. Rabinovitz is a nationally renowned expert in conducting such analyses, has been involved in a number of asbestos-related and other toxic tort-related valuations of current and future liabilities, has served as the expert for two representatives of future claimants in asbestos related bankruptcies and has had her valuation methodologies accepted by numerous courts. Further, the methodology utilized by Dr. Rabinovitz is the same methodology that is utilized by the expert who is routinely retained by the asbestos claimants committee in asbestos-related bankruptcies. Dr. Rabinovitz estimated the probable number and value of unresolved current and future asbestos-related bodily injury claims asserted against DII Industries, LLC and its subsidiaries over a 50 year period; provided, Dr. Rabinovitz indicated, that the basis for estimation in the later years were less certain.

In the past, we have only provided for known outstanding claims as we did not have sufficient information to make a reasonable estimate of future asbestos claims liability. However, as a result of Dr. Rabinovitz's analysis, we are now in a position to accrue not only for known open claims, but also for the projected costs to resolve asbestos claims through 2017. In light of the uncertainties inherent in making long-term projections and as indicated in Dr. Rabinovitz's analysis, although Dr. Rabinovitz's analysis covers 50 years, we do not believe that we have a reasonable basis for estimating under Statement of Financial Accounting Standard No. 5 "Accounting for Contingencies", or SFAS No. 5, asbestos claims, defense costs or probable insurance recoveries past 2017.

The methodology utilized by Dr. Rabinovitz to project DII Industries, LLC's and its subsidiaries' asbestos-related liabilities and defense costs relied upon and included:

- an analysis of DII Industries, LLC's, Kellogg, Brown & Root, Inc's and Harbison-Walker Refractories Company's historical asbestos settlements and defense costs to develop average settlement values and average defense costs for specific asbestos-related diseases and for the specific business operation or entity allegedly responsible for the asbestos-related diseases;

- an analysis of DII Industries, LLC's, Kellogg, Brown & Root, Inc's and Harbison-Walker Refractories Company's pending inventory of asbestos-related claims by specific asbestos-related diseases and by the specific business operation or entity allegedly responsible for the asbestos-related disease;

- an analysis of the claims filing history for asbestos-related claims against DII Industries, LLC, Kellogg, Brown & Root, Inc. and Harbison-Walker Refractories Company since January 1, 2000 (and alternatively since January 1997) by specific asbestos-related disease and by business operation or entity allegedly responsible for the asbestos-related disease;

- an analysis of the population likely to have been exposed or claim exposure to products manufactured by DII Industries, LLC, its predecessors and Harbison-Walker or to Brown & Root construction and renovation projects; and

- epidemiological studies to estimate the number of people who might allege exposure to products manufactured by DII Industries LLC, its predecessors and Harbison-Walker or to Brown & Root construction and renovation projects that would be likely to develop asbestos-related disease.

Dr. Rabinovitz's projections are based on historical data supplied by DII Industries, LLC, Kellogg, Brown & Root, Inc. and Harbison-Walker and publicly available studies, including annual surveys by the National Institutes

of Health concerning the incidence of mesothelioma deaths. In her analysis, Dr. Rabinovitz projected that the elevated and historically unprecedented rate of claim filings of the last several years, especially as expressed by the ratio of nonmalignant claim filings to malignant claim filings, would continue into the future for 5 more years. After that, Dr. Rabinovitz projected that the ratio of nonmalignant claim filings to malignant claim filings will gradually decrease for a 10 year period ultimately returning to the historical claiming rate and claiming ratio. In making her calculation Dr. Rabinovitz alternately assumed a somewhat lower rate of claim filings, based on an average of the last five years of claims experience, would continue into the future for five more years, but we used the two-year period in establishing reserves for our probable and reasonably estimable liabilities and defense costs as we determined it to be more appropriate and was also the more conservative approach.

Other important assumptions utilized in Dr. Rabinovitz's estimates, which we relied upon in making our accrual are:

- an assumption that there will be no legislative or other systemic changes to the tort system;

- that the Company will continue to aggressively defend against asbestos claims made against the Company; and

- an inflation rate of 3% annually for settlement payments and an inflation rate of 4% annually for defense costs.

Based upon her analysis, Dr. Rabinovitz estimated DII Industries, LLC's total, undiscounted asbestos liabilities, including defense costs. Through 2017, the period during which we believe we have a reasonable basis for estimating under SFAS No. 5, Dr. Rabinovitz estimated the current and future total undiscounted liability for asbestos claims, including defense costs would be $2.2 billion (which includes payments related to the approximately 312,000 claims currently pending).

Using Dr. Rabinovitz's projections, we then conducted an analysis to determine the amount of insurance that we estimate is probable that we will recover in relation to the projected claims and defense costs through 2017. In conducting this analysis, we:

- reviewed DII Industries, LLC's historical course of dealings with its insurance companies concerning the payment of asbestos-related claims, including DII Industries, LLC's over 15 year litigation and settlement history;

- reviewed the terms of DII Industries, LLC's prior and current coverage-in-place settlement agreements;

- reviewed the status of DII Industries, LLC's and Kellogg, Brown & Root, Inc's current insurance-related lawsuits and the various legal positions of the parties in those lawsuits in relation to the developed and developing case law and the historic positions taken by insurers in the earlier filed and settled lawsuits;

- engaged in discussions with our counsel; and

- analyzed publicly-available information concerning the ability of the DII Industries, LLC's insurers to meet their obligations through 2017.

Based on that review, analyses and discussions, we made judgements concerning insurance coverage that we believe are reasonable and consistent with our historical course of dealings with our insurers and the relevant case law to determine the probable insurance recoveries for DII Industries, LLC's asbestos liabilities through 2017. This analysis factored in the probable effects of self-insurance features, such as self-insured retentions, policy exclusions, liability caps, current and anticipated insolvencies of DII Industries, LLC's insurers, and various judicial

determinations relevant to DII Industries, LLC's insurance programs.

Based on Dr. Rabinovitz's projections and our analysis of the probable insurance recoveries, we established reserves for the probable and reasonably estimable liabilities and defense costs we believe we will pay through 2017 of $2.2 billion, and we have also recorded receivables for the insurance recoveries that are deemed probable through that same date of $1.6 billion. These reserves and insurance receivables are included in noncurrent assets and liabilities due to the extended time periods involved to settle claims. In the second quarter of 2002, we recorded a pretax charge of $483 million. Of this pretax charge, $330 million, $268 million after-tax, was recorded for claims related to Brown & Root construction and renovation projects and was recorded under the Engineering and Construction Group segment. The balance of $153 million, $123 million after-tax, related to claims associated with businesses no longer owned by us and was recorded as discontinued operations. The low effective tax rate on the asbestos charge is due to the recording of a valuation allowance against the United States federal deferred tax asset associated with the accrual as the deferred tax asset may not be fully realizable based upon future taxable income projections.

The total estimated claims through 2017, including the 312,000 current open claims, are approximately one million. A summary of our reserves for these claims and corresponding insurance recoveries is as follows:

| Millions of dollars | June 30 2002 | December 31 2001 |
|---|---|---|
| Asbestos litigation claims | $ 2,196 | $ 737 |
| Estimated insurance recoveries: | | |
| Highlands Insurance Company | - | (45) |
| Other insurance carriers | (1,594) | (567) |
| Insurance for asbestos litigation claims | (1,594) | (612) |
| Net liability for open and future (through 2017) asbestos claims | $ 602 | $ 125 |

Accounts receivable for billings to insurance companies for payments made on asbestos claims were $30 million at June 30, 2002, and $18 million at December 31, 2001, excluding accounts receivable written off at the conclusion of the Highlands litigation.

The insurance recoveries we have recorded do not assume any recovery from insolvent insurers or from any state insurance guaranty association and assume that all but one of our insurance companies that are currently solvent will remain solvent through 2017. However, there can be no assurances that these assumptions will be correct. The insurance receivables do not exhaust DII Industries, LLC's insurance coverage for asbestos-related liabilities and we believe that DII Industries, LLC has significant insurance coverage available to it for asbestos-related liabilities that it may incur after 2017.

Projecting future events, such as the number of future asbestos-related lawsuits to be filed against DII Industries, LLC and Kellogg, Brown & Root, Inc., the average cost to resolve such future lawsuits, coverage issues among layers of insurers assuming different policies to different policyholders over extended periods of time, the impact on the amount of insurance recoverable in light of the Harbison-Walker and Federal-Mogul bankruptcies, and the continuing solvency of various insurance companies is subject to many uncertainties that could cause the asbestos-related liabilities and insurance recoveries to be higher or lower than those projected and booked.

Given the inherent uncertainty in making future projections, we plan to have the projections periodically reexamined, and update them based on our experience and other relevant factors such as changes in the tort system and the resolution of the bankruptcies of various asbestos defendants. Similarly, we will re-evaluate our projections concerning our probable insurance recoveries in light of any updates to Dr. Rabinovitz's projections, developments in DII Industries, LLC's and Kellogg, Brown & Root, Inc.'s various lawsuits against its insurance companies and other developments that may impact the probable insurance recoveries.


RealMoney.com

Christopher Edmonds

# Under the Radar: What Halliburton's Really Worth
**By Christopher Edmonds**
Special to TheStreet.com

*dated 2/22/02*

02/22/2002 11:48 AM EST
URL: http://www.thestreet.com/p/money/christopheredmondsrm/10010097.html

In the past week, **Halliburton** (HAL:NYSE - news - commentary) shares gained more than 7% on a possible solution to a large portion of its asbestos liability. As a result, investors are becoming more interested in the potential value of the Dallas-based energy services giant. It closed at $15.79 Thursday, still well below its 52-week high near $50.

**A Rocky Road**
Halliburton's up more than 50% since mid-January, when asbestos fears peaked



*.17*
*↑ (7/20/07) # 36.57*
*after hours $36.65*

*Dow down (149.33)*
*NASDAQ (32.44)*
*SP500 (18.78)*

*Closed on 4/28/08 $46.80*

Although last week's news is encouraging, a number of events must occur for Halliburton to parlay the news into a meaningfully higher stock price. The story -- like every other twist in the arduous asbestos sagas -- is complex, and its outcome is still uncertain.

## A Complicated Web

Good news for Halliburton came from Harbison-Walker. This former Dresser Industries subsidiary, now owned by Australian holding company **RHI** (RHI:NYSE - news - commentary), filed for bankruptcy protection in Pennsylvania last week. In conjunction with that filing, the court granted a temporary injunction in more than 200,000 asbestos claims against Halliburton, representing almost three-quarters of

the outstanding asbestos claims against it.

Most of the claims originally were against Harbison-Walker and were inherited by Halliburton when it purchased Dresser in 1998. Dresser had spun off Harbison-Walker in 1992, yet Halliburton ended up with the Harbison-Walker claims because Dresser allowed Harbison-Walker to cover its claims with the insurance that was in place before the spinoff.

The bankruptcy judge agreed to temporarily halt action on those claims. Late Thursday, the court extended the stay until an April 4 hearing. That would allow Harbison-Walker, with Halliburton's help, to establish a trust for administering and settling current and future claims. The trust would be similar to the one used successfully by Johns Manville to control its asbestos liability.

Halliburton also would be better able to define the impact that asbestos will have on its finances. "There is still a lot of ground to be covered, but the risk of asbestos to Halliburton has been lowered by some unknown amount," says Dan Pickering, director of research at Simmons & Co., a Houston energy investment firm and a member of the *TSC* Energy Roundtable.

In another indication of how tangled Halliburton's asbestos web has become, Halliburton was instrumental in Harbison-Walker's bankruptcy filing. Through its Dresser unit, Halliburton will provide $35 million in debtor-in-possession financing to Harbison-Walker, $40 million to help RHI pay for the bankruptcy filing and potentially another $120 million as Harbison-Walker works its way through bankruptcy and an asbestos trust is established. Those figures don't include funds that Halliburton likely would use to fund the asbestos trust, which could be near $500 million, according to Jason Tugman, oil services analyst at Simmons.

## A Long Process

All of this recent news has changed the complexion of Halliburton's asbestos story, but the ending is far from certain.

First, the bankruptcy court must make its temporary injunction permanent, subject to Harbison-Walker's pledge to create a trust. "Based on our research into the bankruptcy issues surrounding asbestos cases and related parties, we are reasonably confident that the stay will become permanent," notes James Stone, oil service analyst at UBS Warburg.

However, establishing the trust will be difficult, requiring 75% of the asbestos plaintiffs to approve its creation. Because the trust would limit plaintiffs' ability to seek large jury verdicts, some trial lawyers are likely to dissuade clients from accepting the trust. However, with Halliburton's ability to offer as much as $2.1 billion in insurance proceeds to fund the trust, the certainty of some settlement should be attractive.

Halliburton's insurance carriers will have to agree to the trust as well and will probably seek to limit their contributions

The real issue may be time. Stone estimates that determining whether 75% of the plaintiffs will agree to the trust could take up to two years. If the Johns-Manville case is any indication, final resolution could take much longer. Manville filed for bankruptcy in August 1982 and didn't emerge with its asbestos trust in operation until November 1988.

That's a long time for plaintiffs to wait, and even longer for investors who are already impatient with Halliburton's asbestos overhang.

## Fair Value

So what is Halliburton worth?

Salomon Smith Barney energy services analyst Geoff Kieburtz estimates that Halliburton would trade around $34 a share without any asbestos liability. Halliburton's recent level of $15.79 suggests the asbestos discount is more than $7.8 billion in market cap. He rates Halliburton outperform and has a $20 price target on the stock. Salomon Smith Barney has provided banking services to Halliburton.

Simmons' Tugman recently calculated potential value for Halliburton shares by comparing it to its closest peer, **Baker Hughes** (BHI:NYSE - news - commentary) , and assigning probabilities of success in establishing a trust. He notes that at the time of his analysis, Baker Hughes was trading at 31 times 2002 earnings estimates, while Halliburton was trading at only 14.2 times 2002 estimates, a difference in the earnings multiple of 16.8 times. Given the similarity of the companies' businesses, he asserts that the discount is almost entirely related to Halliburton's potential asbestos liability. By assigning different probabilities to the trust's success, he calculated the implied fair price for Halliburton.

### What's Halliburton Worth?*  *In Millions*
Tugman applies probability theory to HAL's valuation analysis

| Probability of success | 50% | 40% | 30% | 20% |
|---|---|---|---|---|
| HAL/BHI Probability Reduced Discount | 8.39x | 6.71x | 5.03x | 3.36x |
| Market Cap Increase from Settlement Potential** | $3,715 | $2,972 | $2,229 | $1,486 |
| Less: RHI Payments** | $195 | $195 | $195 | $195 |
| Less: Assumed $500 million trust contrib by HAL** | $500 | $500 | $500 | $500 |
| **Equals Net Market Cap Increase from Settlement** | **$3,020** | **$2,277** | **$1,534** | **$791** |
| Per Share Increase from Settlement Potential | $7.02 | $5.30 | $3.57 | $1.84 |

| Implied HAL Share Price | $21.68 | $19.96 | $18.23 | $16.50 |
|---|---|---|---|---|

*Assumes insurance proceeds used to fund trust, 430 million shares outstanding and HAL 2002 EPS of $1.03.
**In millions.
Sources: Simmons & Co.

For example, if you estimate the likelihood of the trust's success at 50%, Halliburton's discount to Baker Hughes should narrow by 8.39 times, putting Halliburton's fair value at $21.68.

Combine this theoretical exercise with Kieburtz's analysis, and it jibes with what Halliburton CFO Doug Foshee suggested earlier this month: There is a disconnect between the discount the market assigns to Halliburton's asbestos liability and the real impact it's likely to have on the company.

Only time will tell whether Harbison-Walker's strategy is successful, but odds are that higher prices are ahead for Halliburton shares. If so, the real issue facing investors now is how long they'll have to wait.

*Christopher S. Edmonds is president of Resource Dynamics, a private financial consulting firm based in Atlanta. At time of publication, neither Edmonds nor his firm held positions in any securities mentioned in this column, although holdings can change at any time. Under no circumstances does the information in this column represent a recommendation to buy or sell stocks. While Edmonds cannot provide investment advice or recommendations, he welcomes your feedback and invites you to send it to Chris Edmonds.*

mesothelioma and other cancers and compared malignant claims to nonmalignant claims. The researchers determined that nonmalignant claims accounted for ninety percent of the annual claims filed each year, an increase from the eighty percent reported in the late 1980s.[73] As an overall proportion of claims, asbestos-related cancers have decreased over the years.[74]

## C.  *Peripheral Defendants*

In addition to changes in the type of plaintiffs involved in asbestos litigation, asbestos litigation is currently focusing on different defendants than in the past. The initial tier of defendants included asbestos manufacturers, insulation companies, and shipyards.[75] Asbestos manufacturers, such as Johns-Manville, were named defendants early, followed by large shipyards and railroad companies that used asbestos in boilers and shipbuilding.[76] As bankruptcies of the traditional defendants occurred, as will be discussed later in this Article, the plaintiff's bar has targeted so-called peripheral or nontraditional asbestos manufacturers that used asbestos in their products. [77] In addition, workplace defendants that allegedly exposed workers to asbestos on-site have become named defendants in asbestos litigation.[78] In 1983, approximately 300 defendants were implicated in asbestos suits; today that number is 6000.[79] According to the RAND report, asbestos defendants are involved in seventy-five of the eighty-three classifications for industry affecting virtually all parts of the U.S. economy.[80]

Nontraditional defendants pay approximately sixty percent of the costs associated with asbestos liability.[81] Reading "like the Fortune 500", current defendants include companies such as Gerber Products Co., best known as a baby food manufacturer; Sears, Roebuck & Co., a department store; General Electric

---

[73] *Id.* at 44–46.
[74] *Id.*
[75] *Id.* at 47.
[76] *See* PRODUCTS LIABILITY PRACTICE GUIDE, *supra* note 15, §78.02[2]; CASTLEMAN, *supra* note 23, at 225.
[77] RAND REPORT, *supra* note 10, at 47–50.
[78] *Id.*
[79] *Id.* at 49.
[80] *Id.* at 50.
[81] *Id.*

Company; Ford Motor Company and General Motors Corporation; Viacom Inc.; 3M Co.; and Exxon Mobil Corporation.[82] Chemical and pharmaceutical manufacturers, such as Pfizer and the Dow Chemical Company, also have significant asbestos claims exposure.[83]

### D.  *Large Settlements and Even Larger Verdicts*

As of 2000, asbestos claims have cost companies and insurers an estimated fifty-four billion dollars.[84]  Experts estimate that the total costs of asbestos liability, between $200 billion[85] and $275 billion,[86] will be shared by foreign insurers, U.S. insurers, and asbestos defendants.  Foreign insurers are expected to pay thirty-one percent of the cost and U.S. insurers thirty percent, with asbestos defendants paying the remaining thirty-nine percent from their own funds.[87]

Large verdicts and settlements drive up the cost of asbestos litigation, both on an aggregate basis and for individual defendants.  Statistical information available for jury verdicts shows a substantial cost to proceeding with litigation to the verdict stage.  In 2001, thirteen jury verdicts in asbestos litigation exceeded ten million dollars, according to the National Law Journal, which tracks jury verdicts in the United States.[88]  In 1999, only one such asbestos verdict occurred.[89]  Verdicts for a single mesothelioma case have been recorded as high as $55.5 million,[90] and one verdict reached $150 million for claims of lung disease without signs of cancer or asbestosis.[91]  Figure 2 lists some recent

[82]  *The Asbestos Burden*, Editorial, CHI. TRIB., Sept. 25, 2002, at 24, *available at* LEXIS, Chicago Tribune.

[83]  *Id.*; PFIZER INC., Form 10-Q, *supra* note 70.

[84]  RAND REPORT, *supra* note 10, at 53.

[85]  Tillinghast-Towers Estimate, *supra* note 55.

[86]  Bhagavatula et al., *supra* note 56, at 85.

[87]  Tillinghast-Towers Estimate, *supra* note 55.

[88]  *Top Verdicts of the Year: The Big Get Smaller*, NAT'L L.J., Feb. 4, 2002, at C3. *See also Top Verdicts of the Year: Verdicts at a Glance*, NAT'L L.J., Feb. 4, 2002, at C24-C26 (listing the top 100 verdicts of 2001 by dollar amount won).

[89]  *Top Verdicts of the Year: The Big Get Smaller*, *supra* note 88, at C3. Of the top 100 jury verdicts in the country in 2001, eight stemmed from asbestos claims. *Top Verdicts of the Year: Verdicts at a Glance*, *supra* note 88.

[90]  VerdictSearch, *Jury Adds to Request, Awards Family $55.5 Million in Asbestos Case, at* http://www.verdictsearch.com/news/specials/0204verdicts_hernandez.jsp (last visited March 27, 2003).

[91]  VerdictSearch, *Six Asbestos Workers Awarded $25 Million Each,*

POTTS-RIVLIN MACRO 1            4/28/2003 2:05 PM

large verdicts in asbestos litigation and includes information about the type of injury claimed for each verdict. The data shows that even nonmalignant conditions can be costly to companies facing asbestos liability.



### FIGURE 2: RECENT LARGE JURY VERDICTS

| COMPANY | VERDICT SIZE | # OF PLAINTIFFS | INJURY | JURIS. |
|---|---|---|---|---|
| 3 M, AC&S and Halliburton[92] | $150 million: 10/27/01 | 6 | "Asbestos-related lung disease"; not cancer or asbestosis | MS |
| Halliburton and North American Refractories Company[93] | $130 million: 9/12/01 | 5 | Asbestosis, colon cancer, lung cancer | TX |
| Kelly-Moore Paint[94] | $55.5 million: 8/29/01 | 1 | Mesothelioma | TX |
| Harbison-Walker, AC&S and A.P. Green[95] | $40.33 million: 12/5/01 | 5 | Mesothelioma | MD |
| U.S. Gypsum[96] | $35.2 million: 2/13/01 | 22 | Asbestosis | TX |
| North American Refractories Company[97] | $29.74 million: 4/25/01 | 6 | Lung cancer, asbestosis | TX |
| J-M A/C Pipe Company[98] | $20.5 million: 4/6/01 | 1 | Mesothelioma | CA |
| Hopeman Brothers[99] | $19.8 million: 3/20/01 | 3 | Mesothelioma | MD |

*at*   http://www.verdictsearch.com/news/specials/0204verdicts_johnson.jsp   (last

POTTS-RIVLIN MACRO 1                                    4/28/2003 2:05 PM

Settlement costs for an individual plaintiff can also be high for asbestos litigation. Because settlements are often conditioned on confidentiality, information on settlement rates is difficult to obtain. Figure 3 provides examples of settlements received by mesothelioma plaintiffs, as reported by the plaintiff's bar. Settlement values for an individual claim are typically lower than verdict amounts, but still may reach over one million dollars per claim.

visited March 27, 2003).

[92] *Id.*

[93] VerdictSearch, *Alabama Plaintiffs Awarded $130 Million By Texas Jury,* *at* http://www.verdictsearch.com/news/specials/0204verdicts_bell_dresser.jsp (last visited March 27, 2003); *Texas Jury Awards $130 Million to Five Plaintiffs in Asbestos Suit,* ASBESTOS LITIG. REP., Sept. 27, 2001, at 3, *available at* LEXIS, Asbestos Litigation Report.

[94] VerdictSearch, *Jury Adds to Request, Awards Family $55.5 Million in Asbestos Case, supra* note 90.

[95] VerdictSearch, *Baltimore Jury Awards $40M in Asbestos Case,* *at* http://www.verdictsearch.com/news/specials/0204verdicts_cargile.jsp (last visited March 27, 2003).

[96] *Texas Refinery Workers Awarded $35.2 Million,* NAT'L L.J., Feb. 26, 2001, at A12-A13.

[97] VerdictSearch, *Steel Workers and Survivors Obtain $29.7 Million Jury Verdict, at* http://www.verdictsearch.com/news/specials/0204verdicts_ douglas.jsp (last visited March 27, 2003).

[98] *Top Verdicts of the Year: Verdicts at a Glance, supra* note 88; *Jury Awards $ 20.5 Million in Calif. Asbestos Case,* NAT'L L.J., April 30, 2001, at A10.

[99] VerdictSearch, *Toxic Exposure-Asbestos-Shipyard, at* http://www. verdictsearch.com/news/specials/0204verdicts_harlow.jsp (last visited March 27, 2003).

POTTS-RIVLIN MACRO 1                                          4/28/2003  2:05 PM



### FIGURE 3: RECENT REPORTED INDIVIDUAL SETTLEMENTS OF MESOTHELIOMA CLAIMS[100]

| CLAIMANT'S OCCUPATION | APPROXIMATE SETTLEMENT | JURIS. |
|---|---|---|
| Bystander in home renovation project | $4,700,000 | IL |
| Construction worker and laborer | $4,200,000 | TX |
| Navy electrician and Coast Guard Yard supervisor | $4,000,000 | CA |
| Laborer near blast furnaces in a steel mill | $2,500,000 | KY |
| Navy machinist mate and worker in HVAC | $2,500,000 | NY |
| Lumber yard worker | $2,400,000 | CA |
| Drywall sprayer | $2,400,000 | ID |
| Plant worker | $2,300,000 | CT |
| Electrician | $2,000,000 | MS |

While verdicts and settlements of individual claims may reach million dollar figures, claim aggregation, in the form of class actions or consolidated lawsuits, can put extreme pressure on a company to settle, causing considerable litigation losses. As an example, nearly 250 defendants, including large companies such as Honeywell, settled approximately 8,000 asbestos claims in September 2002 in a large consolidated action in West Virginia.[101] While the settlement price was not disclosed per defendant, plaintiffs' counsel announced that the settlement was in the range of hundreds of millions of dollars.[102] Halliburton's settlement of 300,000 claims for four billion dollars overshadows the losses in

---

[100]  The following chart is derived from information culled from the website of Early, Ludwick, Sweeney & Strauss, LLC, a plaintiff's firm with offices in New York and Connecticut.  Early, Ludwick, Sweeney & Strauss, EARLY, LUDWICK, SWEENEY & STRAUSS, LLC - Asbestos Disease, Mesothelioma, Settlements, Trial Verdicts, *at* http://www.elslaw.com/client_settlement.htm (last visited March 27, 2003).

[101]  Jonathan D. Glater, *Many Concerns Settle 8,000 Asbestos Suits*, N.Y. TIMES, Sept. 25, 2002, at C12.

[102]  *Id.* Dow Chemical, one of the defendants that did not settle the case, was recently found liable for exposing "thousands" of its workers to asbestos.  It faces a damages trial in 2003. *W. Va. Jury Finds Union Carbide Liable in Asbestos Mass Trial*, ASBESTOS LITIG. REP., Nov. 7, 2002, at 3, *available at* LEXIS, News.

West Virginia.[103]    Recent aggregate settlements have also been proposed by ABB; as part of a possible bankruptcy plan, the Swiss company offered 110,000 plaintiffs $1.12 billion to settle asbestos suits.[104]

### E.    Increased Bankruptcies

The substantial costs associated with the increase in asbestos claims have driven a number of firms into bankruptcy. Actuarial experts estimate that there have been at least sixty-four asbestos-related bankruptcies since asbestos litigation began,[105] including recent bankruptcies by Grace, Federal-Mogul, and Owens Corning.[106]  The frequency of asbestos-related bankruptcies has also accelerated.    Of the sixty-four so-called "asbestos" bankruptcies referred to above, twenty-two firms were initiated between January 2000 through Spring 2002.  In contrast, only eighteen asbestos-related bankruptcies occurred in the 1990s and sixteen in the 1980s.[107]

One reason for the increase in bankruptcies has been the combination of the higher claim numbers, as discussed above, and the magnitude of the losses associated with such asbestos claims. At the time of its bankruptcy filing, W.R. Grace had already paid over $280 million in asbestos claims,[108] and the company expects 240,000 claims in the future related to asbestos.[109]    Likewise, Federal-Mogul chose to enter bankruptcy after paying over $700 *million in claims*

---

[103]  *Halliburton Settles Asbestos Claims for $4 Billion*, *supra* note 11, at C4.

[104]  Terry Brennan, *For Asbestos Relief, ABB Unit Eyes Chapter 11*, at http://www.The Deal.com , Jan. 7, 2003, *available at* LEXIS, The Daily Deal.

[105]  Letter from Jennifer L. Biggs, Chairperson, Mass Torts Subcommittee, American Academy of Actuaries, to Senator Orrin G. Hatch, Committee on the Judiciary, U.S. Senate 2 (October 2, 2002) (on file with authors).

[106]  Albert B. Crenshaw, *High Court Rejects Delay on Asbestos; Big West Virginia Case Is Cleared for Trial*, WASH. POST, Sept. 17, 2002, at E1 (providing a short history of asbestos litigation and bankruptcies).

[107]  RAND REPORT, *supra* note 10, at vii.

[108]  Susan Drumheller, *Lawyers in Libby Case Bag Million: Grace Bankruptcy is Among the Largest in the Nation*, THE SPOKESMAN-REV. (Spokane, Wash.), Sept. 8, 2002, at A1, *available at* LEXIS, The Spokesman-Review (reporting Grace had $282 million in asbestos-related expenditures in 2000 and filed for bankruptcy in April 2001).

[109]  David B. Siegel, Asbestos Liability: Where is it Going Next? 17 (Oct. 2002) (presentation by General Counsel, W.R. Grace & Co.) (on file with authors).



Tuesday, April 29, 2008

# Our Verdicts And Settlements For Mesothelioma And Lung Cancer Cases

**Get a free copy of our sourcebook, "Mesothelioma, Lung Cancer, Asbestos Litigation And Your Rights."**

Weitz & Luxenberg remains in the vanguard of asbestos and mesothelioma litigation, pioneering ways of recovering awards and winning verdicts for people who have been hurt.

Since 1986, the firm has been representing individuals who have serious injuries related to asbestos, including mesothelioma, lung cancer and asbestosis.

Below is a brief list of our verdicts and settlements in asbestos-related cases:

- $53 million verdict — brake mechanic suffering from mesothelioma
- $37 million verdict — 2 asbestos lung cancer plaintiffs
- $47 million verdict — boilermaker who died from mesothelioma
- $75 million verdict — historic consolidated trial involving men who had worked at the Brooklyn Navy Yard in the 1940s and 1950s
- $12.7 million verdict — iron worker who was injured due to unsafe working conditions
- $64.65 million award — 4 asbestos plaintiffs
- $17.5 million — consolidated trial of 5 mesothelioma victims
- $25 million jury verdict — brake reliner
- $30 million verdict — 7 former power-plant workers suffering from asbestos-related illnesses
- $14 million consolidated verdict — 5 asbestos-related cancer suits: shipyards/powerhouses/construction
- $3.5 million — 2 asbestos exposure cases
- $44 million verdict — 5 asbestos cases, including $11.6 million awarded to widow of sheet metal worker who died of mesothelioma

From shipfitters, pipefitters and demolition workers, to those toiling on railroads and



*Mesothelioma & Asbestosis Mortalities Across the US: 1979-2001 (c/o EWG)*

"We have seen first-hand how asbestos has wreaked havoc on Americans working in naval shipyards, automobile plants, and the construction industry. Most often this is through their employers' conscious choice for profits over a worker's health."

-- Joseph Patrick Williams, a trial attorney in the Asbestos Litigation department of Weitz & Luxenberg

**CONTACT WEITZ & LUXENBERG FOR A *FREE* LEGAL EVALUATION OF YOUR CASE**

First Name

Last Name

Home Phone

Work Phone

City and State

Email

Diagnosed with Asbestosis?     __ Yes     __ No

Lung cancer?     __ Yes     __ No

Mesothelioma?     __ Yes     __ No

Date of diagnosis?

Additional Comments

Send Message

## TABLE OF CONTENTS

- Mesothelioma Home Page
- Mesothelioma and Asbestos
- The Facts on Piping
- Our Toughest Cases
- Diagnosis
- Symptoms, Stages, Treatment
- Latest News
- New York Numbers

Mesothelioma
Mesothelioma Home Page The Clock Is Ticking
IN THIS SECTION



HOME    U.S.    WORLD    BLOGS    BUSINESS & TECH    GLOBAL BUSINESS    HEALTH & SCIENCE    ENTERTAINMENT    MULTIMEDIA    MAGAZINE    SPECIALS

    FAST FACT: NORTON INTERNET SECURITY™ 2008 REQUIRES 83% LESS MEMORY THAN THE COMPETITOR AVERAGE.    Norton

DOWNLOAD FREE TRIAL    Same great protection re-engineered for speed.

# What do the Billions Mean?

*Monday, JAN. 18, 1943* ✶

**TOP STORIES**

America's Forgotten Hostages

Jeremiah Wright Goes to War

Have Mugabe's Foes Turned the Tide?

**RELATED ARTICLES**

**Billion Dollar Blowout**
Several days before Katrina struck, John Walker shut down production and evacuated crews from the o...

**It's the End of Oil / Oil Is Here to Stay**
It's the End of Oil World oil production is about to reach a peak and go into its final decline....

**The Lucky Ones**
You have to stand a ways back, but from a certain angle these look like the lucky ones. In any other...

**Three Cheers for Triangulation**
Ned Lamont's victory over Joe Lieberman in last week's Democratic Senate primary in Connecticut prec...

**Sponsored Links**

**"Teeth Whiteners Exposed"**
7 Teeth Whitening Products Tested, Rated, and Reviewed.
www.best-teeth-whitening.com

**Successful Fundraising**
Learn how to run an online auction for your charity. USA Only, Free Kit
www.cmarket.com

Buy a link here

By this week, when Franklin Roosevelt submitted the most gargantuan budget in history to the U.S. Congress, the nation had been subjected to a baffling barrage of billions-of-dollars-for-war. What did the billions really mean in terms of war production?

Most importantly they meant that though the U.S. will in fact produce far more for war in 1943 than in 1942, nevertheless the rate of production is beginning to level off. Last November the Treasury spent $6.1 billions for war, which is at an annual rate of $73 billions—very close to WPB's hoped-for goals for this year. This means that the rate of increase in new munitions orders is also bound to begin tapering off.

This year's production will involve much less preparation for the future, much more production for immediate use. Significantly, orders for the bellwether machine-tool industry are already running below shipments at the end of 1942—though the backlog is still huge. Last week the Wall Street Journal estimated that total new construction of plants and houses may fall off as much as 50% during 1943. Notable exceptions to the no-more-new-plant decision: synthetic rubber (already dangerously behind schedule) and aviation gasoline.

Important changes are taking place in the kinds of munitions ordered. There will be fewer tanks, ack-ack guns, ammunition; more planes, merchant ships and naval escort vessels. For example, the original 1943 tank program (75,000) has been cut about half, while the hope is to double aircraft and shipbuilding output. This shift in military strategy has caused a great many dislocations, some of them now surmounted. For instance:

>The Army announced last week that the Symington-Gould tank-armor plant in Rochester 

MOST EMAILED

1. Shark Frenzy in Solana Beach
2. Overcharged: Pumps Cheat Drivers
3. Stephenie Meyer: A New J.K. Rowling?
4. Jeremiah Wright Goes to War
5. Ceilar Incest Case Shocks Austria
6. The Coolest D.C. Party Is Still Lame
7. Austria Dad Admits Abuse
8. Tax Rebates Going Out Early
9. Why You Can't Track Your Stolen GPS
10. Air Traffic Controller Sounds Alarm

See Complete List

Get This in Your Email



(N.Y.), on which construction was abruptly halted last November, was being completed for aircraft production. In Kansas City the Darby Corp.'s assembly lines, originally designed to make parts for tank-landing boats, were last week turning out bombs for Flying Fortresses.

> Mack Truck's big tank-part plant at Allentown, Pa. was fortuitously near an abandoned airport. So when tank production was cut back the Allentown plant made an ideal spot for Navy torpedo bomber production by Vultee Aircraft. Cost of the changeover (including fixing up the airport): $6,000,000 v. the $15,000,000 it would have cost to start fresh.

> With the help of 46 subcontractors, American Type Founders has switched its precision tools from making tank guns to airplane parts.

Perhaps the most encouraging aspect of this use of existing plants and tools for new kinds of war production is the flexibility it gives the U.S. war plant to meet new changes in war strategy. Said one WPB production man last week: "If we use tank plants now to make aircraft parts we will be in better shape to switch back to tanks if that becomes necessary."

Grab it! to put Quotes of the Day on your personal page or blog



**Why You Can't Track Your Stolen GPS**
GPS devices are thieves' hot new target. Why your tracking device can't be tracked once it's lost.

More from www.time.com/business

Multimedia Guide Tracks Berlin Wall

Wrigley May be Bought in $22B Deal

Profit Plunges at Toshiba



**Sponsored Links**

**Perfect Escapes Contest**
Enter to win a luxury 3-night Las Vegas escape!

**Save On Contact Lenses**
Save up to 70% on a wide selection of contacts. 110% lowest price guarantee.

**Online Education**
You Can Earn a Degree 100% Online At Florida Tech University Online!

**Male Hair-Loss Prevention**
Get Info About a Once-a-DayTreatment. Ask Your Doctor.

Buy a link here

**FEATURES**

| Nation | Politics | Humor | Arts | Nation |
|---|---|---|---|---|
|  |  |  |  |  |
| Shark Frenzy in Solana Beach | The Coolest D.C. Party is Still Lame | Cartoons of the Week | Stephenie Meyer: The Next J.K. Rowling? | Gitmo's Courtroom Wrangling Begins |

QUICK LINKS: U.S. | World | Blogs | Business & Tech | Health & Science | Entertainment | Photos | Magazine | Specials | Topics

SERVICES: Subscribe | Privacy Policy | Help | Site Map | Contact Us | Ad Info & Design | Terms of Use | Press Kit | Reprints & Permissions | Customer Service Rates

EDITIONS: TIME Domestic | TIME Europe | TIME Asia | TIME South Pacific | TIME For Kids